[Cite as *State v. Gregory*, 2023-Ohio-331.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No.  L-21-1106
                                                                                            L-21-1107
            Appellee
                                                           Trial Court No.  CR0202001023
                                                                                    CR0201903063
v.

Laron Gregory                                           **DECISION AND JUDGMENT**

            Appellant                                   Decided:  February 3, 2023

* * * * *

Julia R. Bates, Lucas Count Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is a consolidated appeal filed by appellant, Laron Gregory, from the

August 26, 2021 judgment of the Lucas County Court of Common Pleas.  For the reasons

that follow, we affirm the judgment.

**{¶ 2}** Appellant sets forth six assignments of error:

1. The trial court erred, to the prejudice of appellant, when it denied appellant's motion to dismiss on grounds of preindictment delay.

2. The trial court abused its discretion in denying appellant's motion to suppress.

3. The trial court abused its discretion in denying appellant's motion for relief from perejudicial [sic] joinder.

4. The court did not mak[e] the proper findings, pursuant to R.C. 2929.14(C)(4), before ordering the sentence imposed in CR2019-3063 to be served consecutive to the sentence imposed in CR2020-1023.

5. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Ohio Constitution.

6. The trial court erred to the prejudice of appellant by not removing appointed counsel after clear indications that communication had broken down between counsel and appellant.

## Background

**{¶ 3}** On October 8, 2018, police conducted surveillance for drug activity in the Kroger parking lot on Alexis Road in Toledo, Ohio; appellant was arrested. A criminal complaint was filed in Toledo Municipal Court ("TMC"), case No. CRA18-13029-0101,

2.

charging appellant with one count of drug abuse, a fifth-degree felony.  Bond was set and posted, appellant waived time, and a preliminary hearing was scheduled for November 28, 2018.  On that date, appellant waived the preliminary hearing and consented to be bound over to the Lucas County grand jury.

### Case No. CR19-3063

{¶ 4} On November 26, 2019, appellant was indicted, in Lucas County, case No. CR19-3063, on seven charges stemming from October 8, 2018: Count 1, trafficking in heroin, a second-degree felony; Count 2, possession of heroin, a second-degree felony; Count 3, trafficking in cocaine, a first-degree felony; Count 4, possession of cocaine, a first-degree felony; Count 5, trafficking in marijuana, a third-degree felony; Count 6, possession of marijuana, a fifth-degree felony; and Count 7, having weapons while under disability, a third-degree felony.

{¶ 5} Appellant was arrested on December 6, 2019, and arraignment was scheduled for December 11, 2019.  Appellant appeared in court, pro se, but did not enter a plea.  Stand-by counsel was appointed and bond was set.  On December 27, 2019, appellant filed a pro se motion requesting the appointment of counsel; counsel was appointed.

{¶ 6} On April 1, 2020, via zoom, appellant orally requested the court have appointed counsel withdraw; the request was denied.  On April 7, 2020, appellant filed a

3.

pro se notice to dismiss appointed counsel. On April 15, 2020, via zoom, counsel was removed and new counsel was appointed.

{¶ 7} On June 23, 2020, appellant's counsel filed a motion for relief from prejudicial joinder and a motion to suppress evidence. A suppression hearing was held on July 20, 2020 and July 28, 2020. On August 18, 2020, counsel for appellant filed a memorandum in support of the motion to suppress, and the state filed an opposition on August 28, 2020. The court issued an opinion on September 9, 2020, denying the motion to suppress. Appellant filed a motion for reconsideration, which the state opposed.

{¶ 8} On November 24, 2020, appellant filed a motion to dismiss, and the state filed an objection on December 23, 2020. A zoom hearing was held on March 25, 2021, after which appellant filed a supplemental motion to dismiss on April 9, 2021. The motion hearing was held on April 19, 2021, and the court issued an opinion denying the motion.

{¶ 9} A jury trial commenced on May 3, 2021, and concluded on May 7, 2021; appellant was found guilty of Counts 1 through 6, and not guilty of Count 7. Sentencing was scheduled for May 24, 2021, at which time the trial court addressed appellant's pro se motions, striking them from the record. The court merged Count 1 with Count 2, Count 3 with Count 4, and Count 5 with Count 6, and the state elected that appellant be sentenced on Counts 1, 3 and 5. The court sentenced appellant to: a mandatory term of five years in prison on Count 1; a mandatory term of seven years in prison on Count 3;

4.

and a 24-month term in prison on Count 5.  All terms were ordered to be served consecutive to each other and consecutive to the sentence imposed in case No. CR20-1023.

**Case No. CR20-1023**

{¶ 10} On November 28, 2019, appellant was stopped by police for operating a vehicle with no front license plate.  Appellant gave his consent to police to search the vehicle and drugs and drug paraphernalia were found; appellant was arrested.  On January 7, 2020, appellant was indicted in case No. CR20-1023, in Lucas County, on four charges: Count 1, trafficking in cocaine, a third-degree felony; Count 2, possession of cocaine, a third-degree felony; Count 3, aggravated trafficking in drugs, a third-degree felony; and Count 4, aggravated possession of drugs, a third-degree felony.  Appellant was arraigned on January 29, 2020, counsel was appointed, and not guilty pleas were entered.

{¶ 11} On April 1, 2020, via zoom, appellant orally requested the court have appointed counsel withdraw; the request was denied.  On April 7, 2020, appellant filed a pro se motion to dismiss appointed counsel.  On April 15, 2020, via zoom, counsel was removed and new counsel was appointed.

{¶ 12} On June 23, 2020, counsel filed a motion for relief from prejudicial joinder.

{¶ 13} A jury trial commenced on May 3, 2021, and concluded on May 7, 2021.  Appellant was found guilty of all four counts.  At sentencing on May 24, 2021, the trial

5.

court addressed appellant's pro se motions, striking them from the record. The court found Counts 1 and 2 merged and Counts 3 and 4 merged; the state elected that appellant be sentenced on Counts 1 and 3, and the court sentenced appellant to serve 18 months in prison on each count. The court ordered all terms to be served consecutive to each other and consecutive to the sentence imposed in case No. CR19-3158,[1] for a total of 17 years in prison. Appellant appealed.

**First Assignment of Error**

{¶ 14} Appellant argues the trial court erred when it denied his motion to dismiss on grounds of preindictment delay. He contends the 13-month delay between the time he was arrested and charged, in case No. CR19-3063, was unwarranted and resulted in actual prejudice to him. Appellant submits that in order to successfully raise the issue of a violation of his right to a speedy trial, he must present evidence of actual prejudice, then the burden shifts to the state to offer evidence of a justifiable reason for the delay.

{¶ 15} Appellant argues under R.C. 2945.71, he must be brought to trial within 270 days of the filing of the original charge, which was October 8, 2018. He maintains the eventual indictment, on November 26, 2019, is well outside of the 270-day period.

{¶ 16} Appellant asserts, at the motion to dismiss hearing, the state offered as the reason for the delayed indictment, that appellant said he knew a large amount of drugs

---

[1] This case number is a clerical error, as appellant was found not guilty of all charges in case No. CR19-3158. The proper case number is CR19-3063. We shall remand the matter to the trial court so the court may correct the issue via a nunc pro tunc entry.

6.

were being brought into the area, and he allegedly stated he would cooperate with police. Appellant notes Toledo Police Department ("TPD") Detective Kenneth Heban testified that appellant worked on and off with police for a year, but reneged on the agreement. The detective acknowledged, based on the evidence collected and the lab results, appellant could have been indicted any time, but the case was not presented to the grand jury because the police wanted to give appellant an opportunity to cooperate.

{¶ 17} Appellant contends the delay between arrest and indictment was not based on new evidence, and caused actual prejudice with respect to the production of video security surveillance from the Kroger parking lot. Appellant submits, absent the lengthy delay, the video would have been available to the state and defense. He maintains the delay violated his right to due process, without legal justification by the state. Appellant also claims he had the right to be free from the specter of a felony indictment looming and the social stigma related to a pending criminal indictment.

{¶ 18} The state counters R.C. 2945.71 requires felony charges to be brought to trial within 270 days when "'a charge of felony is pending.'" The state notes the trial court found the 13-month delay from arrest to indictment was due to appellant's own actions. The state observes when appellant was arrested on October 8, 2018, he offered to help law enforcement to identify dealers of large quantities of drugs, but failed to fulfill his promise. The state maintains the court did not err in concluding the speedy trial

7.

clock was tolled as a result of "'[a]ny period of delay occasioned by the neglect or improper act of the accused.'"

{¶ 19} The state contends appellant has not demonstrated prejudice or lack of justification for the delay in his indictment. Regarding the unavailability of the surveillance video from the Kroger parking lot, the state argues appellant's contention that he was prejudiced relies on several assumptions: the system was operational on October 8, 2018; the cameras would have provided full coverage of the black vehicle as it circled the parking lot; the cameras would have provided full coverage of the location of appellant's vehicle where the hand-to-hand transaction was observed; and the video would have revealed something exculpatory to appellant, but appellant did not identify precisely what that information was. The state asserts appellant does not indicate where these assumptions are supported by evidence in the record, nor does he articulate what his defense would have been if the video was available. The state claims appellant's contention is too speculative to rise to the level of concrete evidence of prejudice.

{¶ 20} As to appellant's arguments that he had the right to be free from the specter of a felony indictment looming and social stigma, the state argues the record does not support that appellant was impaired in any respect. The state submits appellant's business appears to have continued unabated, as he was found in possession of significant amounts of drugs following his 2018 arrest. The state also argues social stigma is only relevant to a postindictment speedy trial claim, as the prejudice appellant must

8.

demonstrate regarding preindictment delay must be something which adversely affects his ability to defend himself at trial.

{¶ 21} In addition, the state contends any incidental prejudice due to preindictment delay must be balanced against the remaining evidence, including newly discovered evidence, to determine if the missing evidence would have minimized or eliminated the impact of the state's evidence. The state maintains the evidence clearly outweighs any speculative arguments offered by appellant. The state further asserts there is no evidence that the preindictment delay was to gain a tactical advantage, nor was it occasioned by neglect or error in judgment.

### Motion to Dismiss/Supplemental Motion to Dismiss

{¶ 22} In the motion to dismiss, appellant argued his right to a speedy trial was violated because he was not brought to trial within 270 days of the original charge of October 8, 2018. He claimed the charges in the indictment stem from the original set of facts, and he asserted the waiver of time he executed in TMC, case No. CRA18-13029-0101, cannot be applied as a time waiver to the new charges (in case No. CR19-3063).

{¶ 23} In his supplemental motion to dismiss, appellant asserted the state was attempting to use a nonprosecution agreement to deny him his right to a speedy trial. He noted the state claimed the reasons for the delay in indicting him were due to his own neglect and intentionally misleading the detectives.

9.

**Motion to Dismiss Hearing**

**{¶ 24}** The hearing was held on April 19, 2021, and the only witness called to testify was Det. Heban. He stated he was assigned to vice narcotics when he received a call, on October 8, 2018, from Det. Rutkowski who was intervention for TPD, and was advised appellant had been stopped and was in custody. Det. Rutkowski knew Det. Heban had been investigating appellant for drug trafficking. Det. Heban arrived at Kroger and was given a summary of events by Det. Rutkowski and Sergeant Korsog, including that drugs were found in plain view and there were two people in the vehicle with appellant.

**{¶ 25}** Det. Heban testified he opened the door to the police car where appellant was sitting and appellant repeatedly said, "I'm fucked." Appellant was read his *Miranda* rights, and Det. Heban informed him that he had been under investigation for several months, bouncing between hotel rooms to avoid detection. Appellant was asked if he would like to cooperate with the investigation or be charged for the narcotics which were recovered. Appellant expressed a willingness to assist the police. He was then booked and charged with a fifth-degree felony.

**{¶ 26}** Det. Heban testified appellant was booked and charged since there were other people who knew appellant was caught with drugs in plain view, and if appellant had not been booked and charged, it would have a chilling effect as other drug traffickers would know appellant was cooperating with police. Det. Heban also testified the drugs

10.

recovered from appellant had been presumptively tested, but not officially weighed when appellant was charged. If the drugs had been officially weighed and appellant was charged with first or second-degree felonies and given a low bond, other drug dealers would know appellant was cooperating with police and appellant's life could be at risk.

{¶ 27} Det. Heban did a consent search of appellant's hotel room, then read appellant his *Miranda* rights again. Appellant was asked what information he could offer, and he said he had knowledge of about 200 kilos of a scheduled narcotic being brought into the city. The detective stated 200 kilos may be the largest drug bust in northwest Ohio history.

{¶ 28} Det. Heban testified appellant was caught with multiple ounces of cocaine and at least an ounce of heroin, which is pretty close to major level drug dealer. The detective worked with appellant on and off for over a year, but appellant broke his promise to cooperate, lied and used delay tactics by not responding promptly to texts or calls. While appellant did provide names to the detective, the people were street level or lower level dealers or people to whom appellant was giving narcotics, not significant, higher level dealers, and the detective had to investigate all of these people which wasted time. The detective believed the delay in indicting appellant was due to appellant's bad leads and failing to return calls.

11.

{¶ 29} Det. Heban testified he did not promise that appellant was not going to be prosecuted, as the detective does not have the power to enter into a nonprosecution agreement.

{¶ 30} Det. Heban was asked, on cross-examination, when he received the lab results for the drugs recovered from appellant, indicating the weight of the drugs and what the drugs were. The detective responded he could not remember when the results were given to him.

## Trial Court Decision

{¶ 31} The court issued its decision on April 19, 2021, denying the motion to dismiss. The court made several findings of fact: the 13-month delay in filing additional charges occurred at appellant's behest; despite appellant's promises to work with police and provide information on higher level drug offenders, appellant failed to respond to calls from the police and failed to deliver on the promises; and although the facts giving rise to all of the charges against appellant were known to the state at the time of the original indictment, the evidence shows the delay in filing additional charges can only be attributed to appellant. The court noted R.C. 2945.72(D) allows the speedy trial timeframe in R.C. 2945.71 to be extended, and the court concluded R.C. 2945.72(D) applies to toll appellant's speedy trial rights.

12.

## Preliminary Analysis

{¶ 32} In determining whether the trial court erred in denying the motion to dismiss, we look to the arguments raised in the trial court, rather than the arguments advanced by appellant on appeal, as some of the arguments are not the same. At the trial court, appellant argued his right to a speedy trial was violated because he was not brought to trial within 270 days of the original charge. On appeal, appellant asserts his right to a speedy trial was violated, but he also asserts he was prejudiced by the 13-month preindictment delay.

{¶ 33} We will limit our examination to the arguments appellant raised in the trial court, that his speedy trial right was violated.

## Standard of Review

{¶ 34} Appellate review of a trial court's denial of a motion to dismiss due to a speedy-trial time violation involves a mixed question of law and fact. *State v. Wright*, 6th Dist. Lucas No. L-21-1101, 2022-Ohio-143, ¶ 14. We give due deference to the trial court's findings of fact if supported by competent, credible evidence, but we must independently review whether the trial court properly applied the law to the facts of the case. *Id.* Hence, we apply a de novo standard of review to the trial court's legal conclusions. *Id.*

13.

## Law

{¶ 35} The Sixth Amendment to the U.S. Constitution provides "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." Article I, Section 10 of the Ohio Constitution also guarantees the right to a speedy trial.

{¶ 36} In felony cases, R.C. 2945.71 requires that the state bring an accused to trial within 270 days of arrest. R.C. 2945.71(C)(2). A triple-count provision is applied for the days that an accused is incarcerated. R.C. 2945.71(E). However, the speedy-trial time may be extended by "[a]ny period of delay occasioned by the neglect or improper act of the accused." R.C. 2945.72(D).

{¶ 37} "'When an accused demonstrates a prima facie case of a speedy trial violation by showing that the trial was held beyond the time limit set by the statute, the burden shifts to the state to show that some statutory exception or exceptions tolled the time.' *State v. Taylor*, 6th Dist. Lucas No. L-98-1375, 2001 WL 1198648, *2." *Wright* at ¶ 19.

{¶ 38} In *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the court identified four factors to be considered in determining whether an accused had been denied a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) the prejudice to the accused.

14.

**Analysis**

{¶ 39} Upon review, we note appellant was originally charged on October 8, 2018, then indicted on November 26, 2019, in case No. CR19-3063. Appellant was arrested on December 6, 2019, and went to trial on May 3, 2021. We conclude appellant was held beyond the time limit set forth in R.C. 2945.71. As such, the state had the burden to show a statutory exception applied, so that appellant's speedy trial rights were not violated. The trial court found R.C. 2945.72(D) applied, as the delay in filing additional charges was attributed only to appellant.

{¶ 40} An examination of the record shows, and we conclude, that the findings of fact in the trial court's decision are supported by competent, credible evidence. The trial court indicated that it found the state's recitation of the facts to be accurate in light of the testimony of Det. Heban presented at the hearing, and those facts included: appellant offered to work off the charges against him by cooperating with police and providing the names of drug dealers selling larger amounts of narcotics; appellant failed, over the next 13 months, to provide that information; appellant refused to return calls from the police; and, at some points in time, appellant failed to interact with officers.

{¶ 41} We further conclude the trial court properly applied the law to the facts of the case by deciding that R.C. 2945.72(D) applied to toll the speedy trial timeframe in R.C. 2945.71, as the record supports the finding that the period of delay was occasioned by appellant's improper acts. The trial court recognized the facts giving rise to all of the

charges against appellant were known to the state at time of the original charge, yet determined the delay in filing the additional charges can only be attributed to appellant, as he promised to assist the police, and repeatedly failed to fulfill his promises.

{¶ 42} We therefore conclude appellant's speedy trial rights were not violated, and the trial court did not err in denying the motion to dismiss. Accordingly, appellant's first assignment of error is not well-taken.

**Second Assignment of Error**

{¶ 43} Appellant argues the trial court abused its discretion when it denied his motion to suppress in case No. CR19-3063. He asserts the police officers who conducted the search and seizure were without probable cause or reasonable, articulable suspicion that he was engaged in criminal activity.

{¶ 44} Appellant admits he was at the Kroger parking lot on October 8, 2018, but asserts Deputy Brian Kennedy, who testified at the suppression hearing, did not observe any hand-to-hand transaction or exchange of drugs, despite being close in proximity to appellant's vehicle. Appellant notes Detective Tim Rutkowski testified he was at the Kroger parking lot on October 8, 2018, but did not witness a drug transaction although he did see suspected drugs inside of appellant's vehicle, and Detective Christopher Johnson testified he witnessed a woman walk up to appellant's vehicle, and saw appellant look at his lap and motion to the woman, but could not see if there was a hand-to-hand exchange

16.

of drugs or money.  Det. Johnson also testified he did see multiple bags of suspected drugs inside of appellant's vehicle, and appellant was known as a drug dealer.

{¶ 45} Appellant submits that while drugs were found in his vehicle, which police officers testified they observed in plain view, the officers approached him randomly and without legal justification.

{¶ 46} The state counters the trial court did not err in denying the motion to suppress, as the court properly found the contraband was in open view of the public, or in the alternative, the officers had a reasonable suspicion that criminal activity was afoot which justified their interaction with appellant, at which time they saw the contraband in plain view.  The state argues officers may properly seize contraband in open view in a vehicle parked in a public lot, as the Fourth Amendment analysis is not invoked.  The state submits Deputy Kennedy approached appellant's vehicle and saw contraband in the console area, in appellant's lap and on the floor of the vehicle.

{¶ 47} The state further contends the trial court properly found the officers had a reasonable, articulable suspicion that appellant was engaged in drug trafficking such that the officers could approach appellant's vehicle, where they observed contraband in plain view.  The state asserts the officers testified they were engaged in surveillance of a business where frequent drug transactions occur, the officers described the typical behavior of drug buyers and testified about the buyer following that pattern by approaching appellant's vehicle.  The state also notes the automobile exception permits a

17.

warrantless search of a vehicle that officers have probable cause to believe contains contraband, and as a result of the contraband in open view, the police could search the vehicle and seize other items that were not in open view.

{¶ 48} The state submits under either analysis, an open view without a Fourth Amendment component, or as a plain view after the vehicle was approached based on a reasonable suspicion, the trial court did not err in denying the motion to suppress.

**Suppression Hearing**

{¶ 49} At the July 20, 2020 suppression hearing, the state called two witnesses. Lucas County Deputy Sheriff Brian Kennedy testified he was assigned to the Northwest Ohio Interdiction Task Force ("task force") two years prior. The task force is made up of several agencies, both federal and state, and it mainly looks for the crime of transporting narcotics. The deputy discussed his training and what he was taught to look for with drug trafficking: vehicle movements; certain areas; people's behavior before they pull into a parking lot; people sitting in a parking lot doing nothing, looking around, working their phones then a car pulls up next to them, an exchange is made or there is a conversation, and they follow each other out of the parking lot; and pedestrians walking through the lot, not having anything to do, looking through the lot.

{¶ 50} Deputy Kennedy testified the Kroger parking lot on Alexis Road is a high crime area targeted by the task force because of the amount of drug trafficking that occurs, and dozens of arrests have been made. On October 8, 2018, in the middle of the

18.

day, task force members were doing stationary surveillance of the parking lot in unmarked cars; the deputy was on one side of the lot, and Det. Johnson was at the opposite side.

{¶ 51} Deputy Kennedy noticed a white female pull through the lot, circling and driving very slowly, looking for somebody. She drove to the front of the lot, parked, got out of her car, walked through the lot and got into the back seat of a parked vehicle, behind the driver. Deputy Kennedy radioed and relayed what he witnessed to Det. Johnson, then changed positions, and pulled in directly behind the parked vehicle. Deputy Kennedy radioed the license plate number of the parked vehicle and it came back registered to appellant. The deputy was told Det. Rutkowski was aware of appellant, as appellant "had a case."

{¶ 52} Deputy Kennedy was about eight feet away from appellant and saw that appellant turned to his right with his hands in the console area, appearing to do something with his hands. The deputy believed appellant was packaging or weighing drugs, getting ready to sell narcotics. There was also a female in the front passenger seat of appellant's vehicle, looking down and watching what appellant was doing. Appellant was looking up and around, like he was nervous, and the female in the back seat was looking, appearing nervous, when she turned and looked directly at the deputy. The unmarked vehicle had tinted windows, so she could not really see in.

19.

{¶ 53} Based on Deputy Kennedy's education, training and 25 years of experience, he believed there was a drug deal going on inside of appellant's vehicle. During his testimony, the deputy was shown Det. Johnson's report, which described that Det. Johnson had witnessed some type of transaction between appellant and one of the women. It was decided the task force members would approach appellant's vehicle.

{¶ 54} Deputy Kennedy walked up to the passenger side of appellant's vehicle and displayed his badge. The windows of appellant's vehicle were open and the deputy saw, in plain view, powder on appellant's lap and hands, powder on the floor, bags on the console area, a scale and cell phone. Appellant was trying to discard a bag of drugs.

{¶ 55} Det. Rutkowski also approached appellant's vehicle and commanded appellant to put his hands outside of the window, as appellant's "hands were completely covered in white powder." Due to the concern that the powder was fentanyl, Det. Rutkowski held appellant's hands until the officers could don gloves and protective equipment. Appellant said he had fucked up and his life was over. He was removed from his vehicle, handcuffed and his hands were washed off with bottled water.

{¶ 56} Next, TPD Det. Tim Rutkowski testified that he has been an officer for 28 years, working patrol for 12 years, then vice narcotics, metro drug task force and the task force for 16 years. He detailed his police training and was taught to look for, in drug investigations: a buyer and seller; and unreasonable stuff that a normal person would not be doing like someone who pulls into a grocery store parking lot, gets on the phone,

20.

moves to another spot, moves to another spot, exits the car, goes into another car and never goes into the store.

{¶ 57} Det. Rutkowski testified the Alexis Road strip is a prime target of the task force as it is a very busy road in close proximity to interstate 75 ("I75"). He was involved in about 20 arrests over the years on that strip, most for drug trafficking. He considers the Kroger on Alexis Road to be a high crime and high drug trafficking area due to the calls for service and the 10-15 drug investigations in which he has participated.

{¶ 58} On October 8, 2018, a majority of the task force members were working at the Kroger parking lot on Alexis Road. The day was bright and clear, Det. Rutkowski was in an unmarked car and he was advised Det. Johnson saw a hand-to-hand transaction, so the vehicle's license plate was run and it came back to appellant. Det. Rutkowski had prior knowledge that Det. Heban was already working a case against appellant, an ongoing drug investigation. Based on his education, training and experience, Det. Rutkowski believed there was drug trafficking going on inside of appellant's vehicle. Deputy Kennedy made the decision that the task force would approach appellant's vehicle.

{¶ 59} Det. Rutkowski walked up to the driver's side of appellant's vehicle, displayed his badge and saw a bag of suspected drugs on the console of the vehicle, and a white bag that appeared to have several bags inside, which was half on appellant's leg and half on the console. The detective believed there were drugs inside of the bags.

21.

Appellant did not initially see the detective standing outside of the vehicle's open window, as appellant's head was down and he was fidgeting with the bag that was on the console. The detective believed appellant was getting drugs for the individuals in the vehicle.

{¶ 60} As soon as Det. Rutkowski announced he was the police, appellant grabbed the bag on the console, threw it down to the floorboard and powder dispersed. Appellant had powder residue on his hands, so the detective advised appellant to put his hands outside of the window, as there was concern that the powder could be fentanyl. The detective grabbed appellant's hands, so he could not reach for a weapon, destroy evidence or flee. Det. Rutkowski testified appellant's hands were semi-wiped clean, he was removed from his vehicle, handcuffed and evidence was collected from his vehicle.

{¶ 61} The suppression hearing was continued until July 28, 2020, and the state called one witness, TPD Det. Christopher Johnson. He testified he has been an officer for 28 years, working SWAT for 15 years and the task force for five years. He described his police training and noted the task force is mainly looking for drug activity in parking lots.

{¶ 62} Det. Johnson testified the Alexis Road strip is a target for investigation because "I75 is a main thoroughway for source states for drug activity," and there are a lot of big chain stores with parking lots. He has participated in at least a dozen arrests over the years on the strip, all involving drug trafficking. The Kroger on Alexis Road is a high crime area, and he has been a part of maybe five arrests for drug related offenses.

{¶ 63} The detective detailed the common behaviors he observes in drug trafficking cases, as "the way people drive into the parking lot, not going into the main store, just sitting in the parking lot on their cell phones, real nervous, looking around, constantly back and forth on their cell phones."

{¶ 64} On October 8, 2018, Det. Johnson was working at the Kroger parking lot on Alexis Road looking for drug activity with other task force members, all in unmarked cars. It was a bright, clear day. He was in the east portion of the lot, opposite from Deputy Kenney, and he was not waiting for appellant, in particular.

{¶ 65} Det. Johnson noticed a female driving a black car around the parking lot, circling, on her phone looking to meet up with somebody. When she parked her car way out in the parking lot far from the store, he moved his SUV. The female got out of her car and instead of walking down the aisle towards the store's doors, she walked in between cars, zigzagging. He repositioned his SUV when she approached a vehicle; he was about 20-30 feet away and had an unobstructed view, so he could see everything. He saw the female get into the back seat of a vehicle.

{¶ 66} A task force member ran the license plate of the vehicle and Det. Johnson was informed it came back to appellant. That was significant as previously, the detective had conversations with another detective that appellant is a known drug dealer. Det. Johnson saw that appellant was busy looking down at his lap, then motion and lean back, as if he gave the female something in a hand-to-hand transaction. Det. Johnson testified

23.

since appellant's vehicle was parked in a public parking lot, anyone walking by could observe what was going on inside of the vehicle. Based on his experience, knowledge and training, Det. Johnson believed there was drug activity going on inside of the vehicle; he was 100 percent sure. The decision was made to approach appellant's vehicle.

{¶ 67} As Det. Johnson walked up to the driver's side of appellant's vehicle, displaying his badge, appellant was still messing around with or doing something in his lap and unaware of the police. Det. Rutkowski gained control of appellant by grabbing his hands through the open driver's side window because his hands were full of powder and the police were worried it was fentanyl. Det. Johnson then noticed bags in the vehicle, of different sizes on the center console, and they were not Kroger or Target bags.

{¶ 68} The detective heard appellant say, "I'm fucked. I'm done." Appellant was removed from his vehicle and handcuffed. In appellant's empty vehicle, Det. Johnson saw white powder on the driver's foot area and plastic baggies with different narcotics on the center console. The two women who had been in appellant's vehicle were not arrested because appellant was the person trafficking drugs, not the women.

### Trial Court's Decision

{¶ 69} The trial court issued an opinion on September 9, 2020, denying the motion to suppress. The trial court noted appellant argued even if police saw narcotics or paraphernalia in plain view in his vehicle, "the officers needed some other lawful reason under the Fourth Amendment" to initially approach his vehicle and avail themselves of

24.

the plain view doctrine. Appellant relied on *State v. Mesley*, 134 Ohio App.3d 833, 732 N.E.2d 477 (6th Dist.1999).

{¶ 70} The trial court also noted the state asserted the contraband observed in appellant's vehicle was detected in open view, not plain view. The state cited to *State v. Harris*, 98 Ohio App.3d 543, 649 N.E.2d 7 (8th Dist.1994), to explain the differences between open view and plain view.

{¶ 71} The trial court found *Mesley* distinguishable, because the task force in appellant's case was conducting general surveillance, and was not specifically investigating appellant. In addition, "despite having zeroed in on [appellant's] actions as being potentially indicative of drug activity, as Detective Kennedy approached [appellant's] vehicle * * * [the detective] observed contraband in open view on [appellant's] lap, on the floor of the vehicle, and on the console." The court further found since the drugs were in open view, not plain view, a Fourth Amendment analysis was not triggered.

{¶ 72} The trial court also found, if a Fourth Amendment analysis was conducted, *State v. Johnson*, 6th Dist. Lucas No. L-03-1046, 2004-Ohio-2458 "indicates that officers herein had a reasonable suspicion that criminal activity was afoot." The trial court found the officers had a reasonable, articulable suspicion that appellant was involved in drug activity, therefore the officers were permitted to approach appellant's vehicle, where they

25.

found contraband in plain view. The court found appellant's case was indistinguishable from the *Johnson* case.

## Standard of Review

{¶ 73} Appellate review of a trial court's denial of a motion to suppress presents mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "'When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.'" (Citation omitted.). *Id.* Thus, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

## Law

{¶ 74} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, protects people against unreasonable searches and seizures. Article I, Section 14 of the Ohio Constitution is almost identical to the Fourth Amendment, and affords Ohioans coextensive protections against unreasonable searches and seizures. *See State v. Robinette*, 80 Ohio St.3d 234, 245, 685 N.E.2d 762 (1997).

{¶ 75} "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant." *State v. Moore*, 90 Ohio St.3d 47, 49, 734 N.E.2d 804 (2000). "A search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies. *See Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)." *State v. Jackson*, ___ Ohio St.3d ___, 2022-Ohio-4365, ___ N.E.3d ___, ¶ 10.

{¶ 76} While the Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion, * * * [w]hat a person knowingly exposes to the public * * * is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 350-351, 19 L.Ed.2d 576, 88 S.Ct. 507 (1967). "For, '* * * [w]hat is observable by the public is observable, without a warrant, by the Government as well. * * *' *Marshall v. Barlow's, Inc.* (1978), 436 U.S. 307, 315 (footnote omitted). Thus, what is in open view cannot be said to be embraced by any reasonable expectation of privacy." *Dunn's Lane, Inc. v. Liquor Control Comm.*, 10th Dist. Franklin No. 89AP-1431, 1990 WL 152949, *3 (Oct. 11, 1990).

{¶ 77} In accordance with this "open view" doctrine, where a police officer can observe contraband without making a prior physical intrusion into a constitutionally protected area, such as when a police officer "sees an object * * * within a vehicle," there "has been no search at all." *Harris*, 98 Ohio App.3d at 547, 649 N.E.2d 7, quoting 1 Wayne R. LaFave, *Search and Seizure*, Section 2.2(a) (2d Ed.1987).

27.

*State v. Harris*

**{¶ 78}** The *Harris* court reasoned that "a distinction should be made between evidence discovered in plain view, invoking Fourth Amendment analysis, and evidence discovered in open view, which does not invoke Fourth Amendment analysis." *Id.* at 546. "'[P]lain view in the *Coolidge* [*v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564] sense does not mean that there has been no search; indeed, the situations described by Justice Stewart are in the main search situations-search pursuant to a warrant naming other objects, search during hot pursuit, search incident to arrest, and a search for purposes other than finding evidence." *Harris* at 546. "Rather, the effort in *Coolidge* is to describe when items so found may be seized even though they were not the items which were legitimate objectives of that search." *Id.*

**{¶ 79}** The facts in *Harris*, adduced at the hearing on Harris' motion to suppress, include two Regional Transit Authority ("RTA") officers were patrolling a RTA parking lot at about 3:30 a.m. to 4:00 a.m., when they noticed a pickup truck with plastic liners covering shattered windows; the truck had not been there an hour earlier. *Id.* at 544. Due to the truck's condition and since the RTA parking lots are not open to the public late at night, the officers investigated, as they suspected the truck was stolen or abandoned. *Id.* at 545. The officers found Harris asleep in the truck; he was awakened and told to step out of the truck. *Id.* As Harris exited the truck, an officer lit up the inside of the truck,

28.

where pills were observed on top of the glove compartment.  *Id.*  Harris was arrested and charged; he then filed a motion to suppress evidence.  *Id.* at 544-545.

{¶ 80} After a hearing, the trial court denied the motion, finding the contraband was located in plain view when discovered by the officers.  *Id.* at 545.  The appellate court found Harris "can hardly claim to have a constitutionally recognized expectation of privacy in a common or public area such as the RTA parking lot" and the pills "were visible to the officers from outside [of] the vehicle."  *Id.* at 547.

{¶ 81} The appellate court affirmed, concluding "[h]aving observed the contraband from outside [of] the vehicle, [the] [o]fficers * * * were justified in seizing it pursuant to the automobile exception to the Fourth Amendment warrant requirement."  *Id.* at 548.  The appellate court also stated, "[e]ven assuming that a plain view analysis is to be applied to the facts sub judice, we conclude that [the] [o]fficers were justified in seizing the contraband in question" as they "were fully justified in approaching the suspicious-looking vehicle" and "asking [Harris] to step out of the vehicle."  *Id.*  The officers "were, therefore, lawfully in a position from which they could observe the contraband in plain view inside [of] appellant's vehicle."  *Id.*

### State v. Mesley

{¶ 82} In *Mesley*, 134 Ohio App.3d at 836, 732 N.E.2d 477, TPD had Mesley under surveillance, based on information from an unknown source, at a strip mall where his wife owned a beauty salon.  Mesley sat in the parking lot for five or ten minutes, then

29.

drove a red van through the lot toward an exit. *Id.* As Mesley was about to drive out of the lot, a blue van drove into the parking lot; Mesley backed up his van to the rear of the lot. *Id.* The blue van then parked in the same area, Mesley got out of his van and into the blue van. *Id.* Officers approached the blue van and saw a bag of pills in Melsey's lap. *Id.* at 837. Mesley was arrested and indicted; he filed a motion to suppress. *Id.*

{¶ 83} The trial court suppressed the drugs seized from Melsey, finding, inter alia, "the police lacked a reasonable, articulable suspicion that criminal activity was in progress when their actions were based solely on a tip combined with observation of individuals parking their vans in the back of the strip mall parking lot." *Id.* The trial court rejected the state's contention that "the pills were seized while in plain view because, without reasonable suspicion, the initial intrusion by the officers was unlawful." *Id.*

{¶ 84} We affirmed. The state had argued the Fourth Amendment does not protect evidence located in an occupied vehicle parked in a public parking lot, as there is no expectation of privacy in the interior of a vehicle, visible to any person passing by, without a prior physical intrusion into a constitutionally protected area. *Id.* at 838-839. We noted the cases cited by the state show that officers "had reasonable suspicion to investigate a parked vehicle before they discovered evidence in 'plain view,' or, prior to making a decision to investigate a particular individual, discovered evidence in 'open

30.

view' within a vehicle." *Id.* at 839.  We rejected the state's argument, and found the bag of drugs on Mesley's lap in "open view" did not trigger the officers' investigation.  *Id.*

{¶ 85} The state had also argued even if the Fourth Amendment applied, the plain view exception allows the use of the contraband seized from Mesley's lap.  *Id.*  We determined "[t]o approach the van in order to see the [drugs] in 'plain view,' the officers needed some other lawful reason under the Fourth Amendment. * * * Other than well-defined exceptions, such as check points, police must have a reasonable, articulable suspicion of criminal activity to stop and investigate a pedestrian or a vehicle."  *Id.* at 840.  Since the officers testified "the decision to approach the blue van in which [Mesley] was a passenger was nothing more than a "hunch" or "general suspicion" that evidence of drug activity might be found," we determined "the trial court correctly concluded that the initial intrusion that afforded the police the plain view of the [drugs] was unlawful."  *Id.*

{¶ 86} Next, the state argued the police did not detain the blue van because it was already stopped, and although police blocked the van and one officer had his gun drawn, this was not a seizure.  *Id.*  We found "the trial court correctly concluded that the detectives did not have a reasonable, articulable suspicion to execute a seizure of [Mesley] for a *Terry* stop * * * and the detectives did not lawfully intrude upon appellee."  *Id.*

31.

## State v. Johnson

{¶ 87} In *Johnson*, 6th Dist. Lucas No. L-03-1046, 2004-Ohio-2458, at ¶ 12, an officer testified at the suppression hearing that police were conducting undercover surveillance of McDonald's parking lot, in unmarked vehicles, as it was known to be a popular drug trafficking location. The officer had been involved in 12 or more drug "busts" at that location, and for a typical drug transaction, the customer often used a cell phone or pay phone, at the drop-off location, and either paged or called the drug dealer. *Id.*

{¶ 88} On the day of Johnson's arrest, the officer saw a man use the pay phone in the McDonald's parking lot, then sit in his vehicle next to the phone; the man did not enter the restaurant. *Id.* at ¶ 13. Five minutes later, Johnson pulled in next to the man, the man got out of his vehicle and approached the passenger side window of Johnson's vehicle. *Id.* at ¶ 14. The officer believed a drug sale was about to transpire because the actions "fit the indicators of the previous arrests," so officers "converged" on Johnson's vehicle. *Id.*

{¶ 89} The officer approached the vehicle from the driver's side, but Johnson had his head down and did not see the officer. *Id.* at ¶ 15. The officer saw Johnson place something on the armrest and, based upon his training and experience, believed it to be crack cocaine; Johnson was also holding crack cocaine. *Id.* The officer went through the driver's open window and grabbed the drugs, at which time, Johnson looked up and was

arrested. *Id*. at ¶ 15-16. In addition to crack cocaine, Dilaudid and $2,000 were found. *Id*. at ¶ 16. Johnson was charged and filed a motion to suppress. *Id.* at ¶ 8-9.

{¶ 90} After a hearing, the trial court denied the motion finding the officers had reasonable suspicion that illegal drug activity was taking place, based on the high crime area, prior activities in that area, and the activity observed. *Id.* at ¶ 18. The trial noted "the 'reasonable suspicion increased' when the officers saw the activity inside [of] appellant's vehicle." *Id.* The trial court found the crack cocaine was in "plain view." *Id.*

{¶ 91} We affirmed, and found, "[l]ooking collectively at the above facts * * * they support a reasonable suspicion that [Johnson] was involved in drug activity." *Id.* at ¶ 18. The officer "was very familiar with drug activity at the McDonald's location and the activities commonly associated with drug transactions, and testified that he observed the crack cocaine, in plain view, through [Johnson's] open vehicle window." *Id.*

**Analysis**

{¶ 92} Upon review, we find the trial court did not err in denying appellant's motion to suppress. We agree with the trial court that appellant's case is indistinguishable from *Johnson*. We find the trial court properly undertook a Fourth Amendment analysis, which led to the correct conclusion that the task force officers had a reasonable, articulable suspicion that appellant was involved in drug activity, thus the officers were permitted to approach appellant's vehicle, where they saw contraband in plain view through appellant's open window.

33.

{¶ 93} Like *Johnson*, the officers conducting surveillance at the Kroger parking lot had reasonable suspicion that drug trafficking was taking place, based on the high crime area, prior activities in that area, the activities observed, and reasonable suspicion increased when officers saw the movement inside of the vehicle. Reasonable suspicion further increased when the officers learned appellant was the owner of the vehicle, as appellant was a known drug dealer. As the officers approached appellant's vehicle, white powder and baggies containing drugs were in plain view. Since the officers had reasonable, articulable suspicion that appellant was engaged in criminal activity, the officers did not randomly approach appellant without legal justification. Accordingly, appellant's second assignment of error is not well-taken.[2]

## Third Assignment of Error

{¶ 94} Appellant argues the trial court abused its discretion in denying his motion for relief from prejudicial joinder. He sought to have separate trials for his three criminal cases,[3] while the state suggested a 30-minute break between the presentation of the cases. Appellant submits while all of the charges involve allegations of drug-related criminal activity, the cases are temporally separate, occurred at different locations and are otherwise unconnected. He contends he was prejudiced by the denial of his motion, as

---

[2] Having found the trial court did not err in denying appellant's motion to suppress, it is unnecessary for us to address the other basis on which the trial court denied the motion to suppress: the open view doctrine.
[3] Case Nos. CR19-3063, CR19-3158 and CR20-1023.

the jury heard highly prejudicial evidence of multiple drug related investigations involving him. Appellant observes Crim.R. 14 governs a motion for relief from prejudicial joinder.

{¶ 95} The state counters a trial court does not abuse its discretion when it denies a motion to sever charges if the evidence related to each case is simple and direct. The state observes Crim.R. 8(A) permits the joinder of two or more offenses, and joinder of claims for trial purposes is favored. The state argues in order to prevail on a claim that a trial court erred in denying a motion to sever, appellant has the burden of affirmatively showing, inter alia, his rights were prejudiced. The state maintains the drug trafficking cases against appellant were reasonably separated based on different dates and locations, and the court allowed a break of almost two hours between the presentation of the first and second cases.

## Law

{¶ 96} Crim.R. 14 governs relief from prejudicial joinder and states in relevant part:

> If it appears that a defendant or the state is prejudiced by a joinder of
> offenses or of defendants in an indictment, information, or complaint, or by
> such joinder for trial together of indictments, informations or complaints,
> the court shall order an election or separate trial of counts, grant a
> severance of defendants, or provide such other relief as justice requires. In

ruling on a motion by a defendant for severance, the court shall order the prosecuting attorney to deliver to the court for inspection pursuant to Rule 16(B)(1) any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.

{¶ 97} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992).

{¶ 98} In *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus, the Supreme Court of Ohio held:

A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

{¶ 99} The state may challenge a claim of prejudice in two ways. *State v. Johnson*, 88 Ohio St.3d 95, 109, 723 N.E.2d 1054 (2000). First, is the "other acts" test, and second, is the "joinder" test, "where the state is merely required to show that evidence of each of the crimes joined at trial is simple and direct." *Id.* If the state proves

36.

the joinder test, it does not have to establish the "other acts" test. *Id.* "Thus, an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes." *Id.*, citing *Torres*.

{¶ 100} Further, "the jury is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *Torres* at 343. While "[j]oinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, * * * it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." *Id.* at 343-344. "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224, 1225, 2010-Ohio-4202, ¶ 33. *See also State v. Hall*, 6th Dist. Lucas No. L-20-1089, 2021-Ohio-2968, ¶ 43.

{¶ 101} On appeal, the appellant must demonstrate the trial court abused its discretion in refusing to separate the charges and cases for trial. *Torres* at 343.

**Analysis**

{¶ 102} Upon review, appellant argued he was prejudiced because the jury heard highly prejudicial evidence of multiple drug-related investigations and charges relating to him. Yet, he recognized he was found not guilty of all of the charges in case No. CR19-315, although he insisted "the jury heard enough evidence in CR2019-3063 to concluded

37.

[sic] that Appellant must also be guilty in CR2020-1023." The state, however, countered the evidence of each of the crimes joined at trial was simple and direct.

{¶ 103} A review of the evidence presented at trial shows it to be straightforward, uncomplicated and separable. We therefore conclude the state showed the evidence as to each indictment was simple and direct. We further conclude appellant did not affirmatively show he was prejudiced because of the joinder of cases, thus he did not demonstrate the trial court abused its discretion in refusing to separate the cases for trial. Accordingly, appellant's third assignment of error is not well-taken.

### Fourth Assignment of Error

{¶ 104} Appellant argues the trial court did not make the proper findings, pursuant to R.C. 2929.14(C)(4), before ordering the sentences imposed in case Nos. CR19-3063 and CR20-1023 to be served consecutively to each other. Appellant concedes the court appears to have made the required findings before imposing consecutive sentences in case No. CR19-3063 on Counts 1, 3 and 5 and in case No. CR20-1023 on Counts 1 and 3.

{¶ 105} The state counters the trial court made the necessary findings for imposing consecutive sentences. The state notes the court treated the cases individually, as some of appellant's offenses were committed before community control was imposed in another case, while some offenses were committed after the imposition of community control.

{¶ 106} The state asserts the court made additional findings related to a course of conduct, and to appellant's criminal history, such that consecutive sentences were

38.

necessary to protect the public. The state also submits the court's findings were incorporated in the sentencing entry.

{¶ 107} The state maintains the circumstances of the cases, involving drug trafficking offenses committed on two dates, by someone with a long criminal history, supported the court's findings that consecutive sentences were necessary to protect the public, consecutive sentences were not disproportionate to the seriousness of the offender's conduct, and to the danger appellant posed to the public.

### Law

{¶ 108} The standard of appellate review for felony sentences is set forth in R.C. 2953.08, which provides, inter alia, that appellate review is limited to whether there is clear and convincing evidence to support the trial court's findings and whether the sentence is contrary to law. R.C. 2953.08(G)(2). *See also State v. Tammerine*, 6th Dist. Lucas No. L-13-1081, 2014-Ohio-425.

{¶ 109} Generally, multiple terms of incarceration are to be served concurrently unless the trial court orders the sentences to be served consecutively. R.C. 2929.41(A) and (B)(2); R.C. 2929.14(C)(4). Before imposing consecutive sentences, R.C. 2929.14(C)(4) mandates the trial court find: consecutive sentences are "necessary to protect the public from future crime or to punish the offender"; consecutive sentences are "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and one of the following circumstances is present:

39.

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. R.C. 2929.14(C)(4).

{¶ 110} The trial court must engage in the correct analysis, state its statutory findings during the sentencing hearing, and incorporate those findings into its sentencing entry. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 253, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

**Analysis**

{¶ 111} Upon review, the record shows at appellant's sentencing hearing, the trial court stated with respect to case No. CR19-3063:

40.

[T]he Court is going to order counts one, three and five be served consecutive. The Court finds that the consecutive sentence is necessary to protect the public from future crime or to punish the Defendant. They [consecutive sentences] are not disproportionate to the seriousness of Defendant's conduct or the danger the Defendant poses. The Court further finds the harm caused was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of the offender's conduct, and that the Defendant's criminal history requires consecutive sentences. * * * We are dealing with count one, trafficking in heroin, a separate substance in count three, cocaine, both large amounts of each. And then, in count five a third substance, marijuana. So Mr. Gregory was, clearly, operating a criminal enterprise of selling multiple drugs on the street to whoever was looking for whatever substances he had.

{¶ 112} With respect to case No. CR20-1023, the court stated:

[T]he Court does find that those two charges, counts one and three, are to be ordered consecutive to each other. The Court does specifically find that consecutive sentences are necessary to protect the public from future crime or to punish the Defendant, they are not disproportionate to the seriousness of the Defendant's conduct or the danger that he poses and presents to our

community. The Court has the additional finding that he was under community control at the time of this in [case No.] CR18-2500 and he goes out and commits two new crimes. Once again, those are with two different substances. Count one is trafficking in cocaine, a felony of the third degree. Count three is trafficking in methamphetamine, which is an additional substance from what he was selling in the CR19-3063 convictions. So in CR20-1023 counts one and three are ordered to be served consecutive for the same reasons as just advised with Defendant's criminal history requiring consecutive sentences within each of the two cases. It also is required that * * * case number 19-3063, in its entirety, be served consecutive to the sentence in CR20-1023. The total sentence in CR19-3063 is a 14-year sentence, and the total sentence in CR20-1023 is a three-year sentence. * * * So the 14-year sentence plus the three-year sentence is a 17-year total sentence, which will be ordered enforced as such.

{¶ 113} In the sentencing judgment entry for case No. CR19-3063, regarding consecutive sentences, the trial court set forth:

It is ORDERED that defendant serve a mandatory term of 5 years as to Count One, a mandatory term of 7 years as to Count Three and 24 months as to Count Five to be served consecutively to each other and to the 3 year

prison term ordered in CR2020-1023[4] for an aggregate prison term of 17 years. Being necessary to fulfill the purposes of R.C. 2929.11 and 2929.14(C)(4), consecutive sentences are necessary to protect the public from future crime or to punish the offender and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The court further finds the harm caused was great or unusual such that no single prison term is adequate, and the defendant's criminal conduct demonstrates that consecutive sentences are necessary to protect the public, therefore the sentences are ordered to be served consecutively.

{¶ 114} In the sentencing judgment entry for case No. CR20-1023, regarding consecutive sentences, the trial court set forth:

It is ORDERED that defendant serve a term of 18 months as to Count One and 18 months as to Count Three to be served consecutively to each other and consecutively to the 14 years ordered in CR2019-3158[5] for a[n] aggregate prison term of 17 years * * *. Being necessary to fulfill the purposes of R.C. 2929.11 and 2929.14(C)(4), consecutive sentences are

---

[4] We note this prison term is a clerical error, as the trial court sentenced appellant to two terms of 18 months, for a total of 36 months at the sentencing hearing.
[5] This case number is a clerical error, as we noted in the first footnote. The proper case number is CR19-3063.

43.

necessary to protect the public from future crime or to punish the offender and are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The court further finds the defendant was on community control, and the defendant's criminal history demonstrates that consecutive sentences are necessary to protect the public, therefore the sentences are ordered to be served consecutively.

**Analysis**

{¶ 115} Upon review, we find the trial court engaged in the required analysis, made the necessary findings and satisfied all of the R.C. 2929.14(C)(4) requirements at the sentencing hearing when it ordered the sentences imposed in case Nos. CR19-3063 and CR20-1023 to be served consecutively to each other.

{¶ 116} The record reflects the trial court referenced appellant's criminal history and indicated that consecutive sentences were necessary to protect the public from future crime by appellant or to punish him. The court stated consecutive sentences were not disproportionate to the seriousness of appellant's conduct and to the danger he poses to the public. The court also expressed that the harm appellant caused was so great or unusual that no single prison term for any of the offenses he committed as part of any of his courses of conduct adequately reflected the seriousness of his conduct. In addition, the court found appellant was on community control in another case when he committed the crimes in case No. CR20-1023.

44.

{¶ 117} To the extent that appellant claims the trial court did not make the required findings before ordering that the sentences for Counts 1, 3 and 5 in case No. CR19-3063 be served consecutively to the sentences imposed for Counts 1 and 2 in case No. CR20-1023, we disagree with appellant's interpretation of the record. We interpret the trial court's explanation of its sentence to mean: (1) the findings it made in case No. CR20-1023 were also applicable to case No. CR19-3063, but while appellant was not on community control when he committed the offenses in case No. CR19-3063, his criminal history supported consecutive sentences in case No. CR19-3063; and (2) these findings also support consecutive service as between the sentences in the two cases. Although the trial court's explanation could have been stated more artfully, we conclude the trial court made the required consecutive sentencing findings during the sentencing hearing, and we conclude those findings are supported by the record. We further conclude the court made the required consecutive sentencing findings in the judgment entries of sentence. As such, we conclude appellant's sentence is not contrary to law.[6] Accordingly, appellant's fourth assignment of error is not well-taken.

## Fifth Assignment of Error

{¶ 118} Appellant argues he received ineffective assistance of counsel in violation of his constitutional rights. First, appellant asserts counsel was ineffective for failing to

---

[6] Since there is a clerical error in the judgment entry for case No. CR20-1023, we will remand this matter to the trial court to correct the error via a nunc pro tunc entry, so the judgment entry can accurately reflect the penalty imposed at the sentencing hearing.

45.

file a motion to suppress evidence in case No. CR20-1023, as the case involved a traffic stop which provided reasonable grounds for a suppression issue. Next, appellant contends counsel did not directly argue, in the motion to dismiss, that appellant suffered actual prejudice on grounds of preindictment delay. Appellant submits counsel, at the hearing on the motion, inferred a 13-month preindictment delay "was prejudicial per se without presenting an argument demonstrating Appellant's actual prejudice with regard to the video surveillance of the Kroger parking lot that was not available after a thirteen-month delay." Last, appellant claims counsel did not file a motion to dismiss based on speedy trial violation postindictment in any of appellant's cases.

{¶ 119} The state counters appellant has not proven ineffective performance of counsel or a prejudicial effect due to a deficiency. The state submits appellant identified a potential motion to suppress that counsel could have filed, but appellant's burden is to demonstrate that had the motion been filed, there is a reasonable probability that the result of the trial would have been different. The state also argues while appellant alleged his counsel did not directly argue, in the motion to dismiss, that appellant suffered actual prejudice with regard to the video surveillance of the Kroger parking lot that was not available after the a 13-month delay, appellant did not indicate what material would have been revealed on the surveillance tapes. The state further contends that although appellant claims his counsel did not file a motion to dismiss based on speedy trial

46.

violation postindictment, appellant did not argue or analyze that delay resulted in a violation of Ohio's speedy trial statute or the constitutional guarantees of a speedy trial.

**Law**

{¶ 120} In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-step process for evaluating an allegation of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

{¶ 121} In addition, "[j]udicial scrutiny of [trial] counsel's performance must be highly deferential. *Id.* at 689. Thus, a reviewing court "should recognize that [trial] counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. *See also State v. Bradley*, 42 Ohio St.3d 136, 141-142, 145, 538 N.E.2d 373 (1989).

{¶ 122} The failure of counsel to file any motion, "'in and of itself, is not per se ineffective assistance of counsel.'" (Citation omitted.) *State v. Henry*, 10th Dist.

47.

Franklin No. 16AP-846, 2018-Ohio-1128, 110 N.E.3d 103, ¶ 65. *See also Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). "Rather, '[w]ithout proving that trial counsel was deficient for failing to make certain motions and that those motions had a reasonable probability of success, the ineffective assistance of counsel claim fails.'" (Citation omitted.). *Henry* at ¶ 65.

{¶ 123} In order to demonstrate ineffective assistance for counsel's failure to file a motion to suppress, a defendant must establish: "(1) a basis for the motion to suppress; (2) that the motion had a reasonable probability of success; and (3) a reasonable probability that suppression of the challenged evidence would have changed the outcome at trial." *State v. Clark*, 6th Dist. Williams No. WM-09-009, 2010-Ohio-2383, ¶ 21.

{¶ 124} To support an ineffective assistance claim on the basis that counsel failed to file a motion to dismiss due to speedy trial violation, "the defendant must show there was a valid basis for moving to dismiss based on a speedy trial violation and that such a motion would have affected the outcome." *State v. Morgan*, 9th Dist. Medina No. 07CA0124-M, 2008-Ohio-5530, ¶ 42.

{¶ 125} The defendant bears the burden of proof on the issue of counsel's ineffectiveness, as in Ohio, a licensed attorney is presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

48.

**Analysis**

{¶ 126} Upon review, we find appellant has not sustained his burden of showing he received ineffective assistance of counsel.

{¶ 127} As to the assertion that counsel was ineffective for failing to file a motion to suppress in case No. CR20-1023, appellant offered no basis for the proposed motion to suppress. He merely asserts the case involved a traffic stop which provided reasonable grounds for a suppression issue, but he does not articulate what those grounds could have been. Further, appellant did not argue the proposed motion had a reasonable probability of success, nor did he assert there was a reasonable probability that suppression of the challenged evidence would have changed the outcome at trial. *See Clark*. Notably, appellant does not suggest the traffic stop was unlawful, that he was wrongfully detained, or that his consent to search his vehicle was not valid. We find appellant's broad assertion that his trial counsel was ineffective for failing to file a motion to suppress in case No. CR20-1023, is insufficient to sustain his burden of showing he received ineffective assistance of counsel.

{¶ 128} Regarding the contention that counsel did not directly argue that appellant suffered actual prejudice with regard to the unavailability of video surveillance of the Kroger parking due to the 13-month delay, appellant has not alleged that the video contained evidence favorable to him or that the video would have been exculpatory. In addition, appellant does not argue how this performance fell below an objective standard

49.

of reasonableness, and appellant does not argue or demonstrate how the result would have been different, but for the alleged deficiencies of counsel. Since appellant did not satisfy the two-step test set forth in *Strickland*, this contention fails.

{¶ 129} Finally, appellant claims his trial counsel was ineffective because counsel did not file a motion to dismiss based on speedy trial violation postindictment in any of appellant's cases. However, it is not apparent if appellant's claim relates to the statutory or constitutional right to speedy trial for any or all of his cases, as he presents no argument in support of his vague claim, and cites to no authority, or parts of the record. As such, there is no proper argument for consideration and appellant has not met his burden, so this claim fails. *See* App.R. 16(A)(7).

{¶ 130} Because appellant relied on bare claims that his trial counsel was ineffective, appellant failed to meet his burden of proof. Accordingly, appellant's fifth assignment of error is not well-taken.

### Sixth Assignment of Error

{¶ 131} Appellant argues the trial court erred by not removing appointed counsel after there were clear indications that communication had broken down between counsel and appellant. Appellant contends his communication with counsel was continually argumentative, and counsel did not serve appellant's best interest because counsel failed to file the motions appellant requested.

50.

{¶ 132} The state counters appellant filed a "Notice to Dismiss, Ineffective Counsel" with the trial court during trial, on May 5, 2021, but appellant acknowledged he had mailed the notice the previous week. The state notes appellant's counsel represented that he and appellant seemed to have had a very good relationship the past few days, to which appellant responded he did not want to address the issue at that point. The court stated his "legal interpretation of that is it is withdrawn," and appellant relied, "Okay."

{¶ 133} The state asserts when a defendant makes and withdraws a motion, he abandons even plain error for appeal purposes, so appellant's arguments should not be considered. If appellant's arguments are considered, the state asserts they should be rejected as the record does not support any finding that communications had completely broken down, a conflict of interest or an irreconcilable conflict existed between appellant and counsel.

**Law**

{¶ 134} In *State v. Horn*, 6th Dist. Ottawa No. OT-03-016, 2005-Ohio-5257, ¶ 11-12, we set forth:

> "An indigent defendant has a right to competent counsel, not a right
> to counsel of his own choosing." *State v. Blankenship* (1995), 102 Ohio
> App.3d 534, 558, 657 N.E.2d 559, citing *Thurston v. Maxwell* (1965), 3
> Ohio St.2d 92, 93, 209 N.E.2d 204. There is no constitutional right to a
> "meaningful attorney-client relationship." *Morris v. Slappy* (1983), 461

51.

U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610. "Rather, an indigent defendant is entitled to the appointment of substitute counsel only upon a showing of good cause, such as conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result." *Blankenship*, supra at 558, 657 N.E.2d 559.

To discharge a court-appointed attorney, the defendant must demonstrate to the court justifiable cause for both the discharge of the appointed counsel and the request for appointment of new counsel. *See State v. Edsall* (1996), 113 Ohio App.3d 337, 339, 680 N.E.2d 1256. The existence of "hostility and tension" or "personal differences" which do not rise to the level of interfering with the preparation or presentation of a defense are not sufficient to justify discharging court-appointed counsel. *See State v. Henness* (1997), 79 Ohio St.3d 53, 65-66, 679 N.E.2d 686.

{¶ 135} Thus, the defendant must show "a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *Henness* at 65, quoting *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), paragraph four of the syllabus. "The term of art 'actual conflict' refers not to a personality conflict but to a conflict of interest." *Henness* at 65, citing *Strickland*.

52.

**{¶ 136}** When a defendant files a motion in the trial court then later withdraws the motion, he waives those arguments for consideration by the trial court and appellate court. *State v. Campbell*, 69 Ohio St.3d 38, 44, 630 N.E.2d 339 (1994). *See also State v. Robinson*, 4th Dist. Washington No. 16CA22, 2017-Ohio-8273, ¶ 32.

### Analysis

**{¶ 137}** Upon review, during trial, the trial judge observed appellant had filed a "Notice to Dismiss, Ineffective Counsel." Appellant noted he had mailed the notice the previous week, and appellant's counsel represented he and appellant seemed to have had a very good relationship the past few days. Appellant stated he did not want to address the issue, so the judge interpreted that as a withdrawal of appellant's motion. Appellant therefore waived any arguments that the trial court erred by not removing his appointed counsel.

**{¶ 138}** Even if appellant's arguments were considered, there is no indication that appellant and his counsel suffered a complete breakdown in communications or a total lack of cooperation and trust, so as to prevent the preparation or presentation of a defense. Moreover, there is no suggestion that an "actual conflict" or conflict of interest existed between appellant and his counsel. Accordingly, appellant's sixth assignment of error is not well-taken.

53.

**Conclusion**

{¶ 139} The judgment of the Lucas County Court of Common Pleas is hereby affirmed, but we remand the matter for a nunc pro tunc judgment entry to correct the errors in the sentencing entry. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. All pending, pro se motions are hereby stricken from the record.

Judgment Affirmed
and Remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J. 

_____
JUDGE

Christine E. Mayle, J. 

Myron C. Duhart, P.J. 

_____
JUDGE

CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.